**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

TEXAS GUN RIGHTS, INC., *et al.*,

      *Plaintiffs*,

   v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,

      *Defendant*.

Civil Action No. 4:23-cv-578-O

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

I.     Statutory and Regulatory Background ..............................................................................2

II.    ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces" ...............................................................................................................4

III.   The Rule ........................................................................................................................7

IV.   This Lawsuit ...................................................................................................................10

LEGAL STANDARDS .........................................................................................................11

ARGUMENT ........................................................................................................................11

I.     Plaintiffs are unlikely to succeed on the merits of their claims. ..................................11

       a.     Plaintiffs lack standing. ...........................................................................11

       b.    The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions ..................................................12

       c.     The Rule is reasonable. ............................................................................21

       d.    The Rule does not infringe on the right to bear arms. ...........................23

             1.    Firearm braces are not bearable arms protected by the Second Amendment. .......................................................................................................23

             2.    Registration of short-barreled rifles does not implicate the Second Amendment. .......................................................................................................24

             3.    Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment. ................................................................26

             4.    Historical tradition of regulation supports the Rule and the NFA ................28

       e.     The Rule is not vague. ..............................................................................32

       f.     The NFA does not offend the nondelegation doctrine. ...........................34

II.    Plaintiffs cannot demonstrate irreparable harm .............................................................36

III.   The balance of the equities and public interest do not favor an injunction. ...............38

IV.   In all events, any relief should be limited to redress Plaintiffs' alleged injuries. ........40

CONCLUSION ....................................................................................................................41

# TABLE OF AUTHORITIES

## Cases

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
   878 F.2d 806 (5th Cir. 1989) ....................................................................................................11

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ....................................................................................................41

*Bezet v. United States,*
   714 F. App'x 336 (5th Cir. 2017)............................................................................................25

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) .................................................................................................................27

*Career Colls. & Schs. Of Tex. v. U.S. Dep't of Educ.,*
   --- F. Supp. 3d ---, 2023 WL 4291992 (W.D. Tex. June 30, 2023) ......................................36

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) ....................................................................................................20

*Castro v. City of Grand Prairie,*
   2021 WL 1530303 (N.D. Tex. Apr. 19, 2021) ......................................................................38

*Chacon v. Granata,*
   515 F.2d 922 (5th Cir. 1975) ..................................................................................................37

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) .................................................................................................................15

*Coates v. City of Cincinnati,*
   402 U.S. 611 (1971) .................................................................................................................33

*Dalton v. Specter,*
   511 U.S. 462 (1994) .................................................................................................................36

*Daniels Health Sciences v. Vascular Health Sci.,*
   710 F.3d 579 (5th Cir. 2013) ..................................................................................................38

*Del. Dep't of Nat. Res. & Env't Control v. EPA,*
   785 F.3d 1 (D.C. Cir. 2015)....................................................................................................28

*DHS v. New York,*
   140 S. Ct. 599 (2020)...............................................................................................................40

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ......................................................................................................... 23, 26

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ................................................................................................ 21, 22

*Enter. Int'l Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
  762 F.2d 464 (5th Cir. 1985) .............................................................................................11

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ..........................................................................................................21

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ..........................................................................................................21

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
  695 F.3d 330 (5th Cir. 2012) ........................................................................................ 11, 12

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ......................................................................................................40

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ..........................................................................................................13

*Google, Inc. v. Hood,*
  822 F.3d 212 (5th Cir. 2016) ............................................................................................38

*Guedes v. ATF,*
  356 F. Supp. 3d 109 (D.D.C. 2019), *aff'd,* 920 F.3d 1 (D.C. Cir. 2019) ...............................13

*Gun Owners of Am., Inc. v. Garland,*
  19 F.4th 890 (6th Cir. 2021) .............................................................................................15

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ......................................................................................................35

*Hayward v. U.S. Dep't of Lab.,*
  536 F.3d 376 (5th Cir. 2008) ............................................................................................21

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) .......................................................................................................... 31, 32

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ................................................................................. 23, 26, 27, 28

*Huawei Techs. USA, Inc. v. FCC,*
  2 F.4th 421 (5th Cir. 2021) ...............................................................................................28

*Huddleston v. United States,*
  415 U.S. 814 (1974) ............................................................................................................3

*Itserve All., Inc. v. Nielsen,*
   2019 WL 2539240 (N.D. Tex. Feb. 11, 2019) ..................................................................12

*JetPay Corp. v. IRS,*
   26 F.4th 239 (5th Cir. 2022) ..........................................................................................32

*John Doe Co. v. CFPB,*
   849 F.3d 1129 (D.C. Cir. 2017)......................................................................................37

*Kanarr Corp. v. United States,*
   188 Ct. Cl. 1051 (1969) ............................................................................................16, 17

*Kelly Servs., Inc. v. Creative Harbor, LLC,*
   846 F.3d 857 (6th Cir. 2017) ..........................................................................................19

*Kolender v. Lawson,*
   461 U.S. 352 (1983) ..................................................................................................32, 33

*Lane v. Holder,*
   703 F.3d 668 (4th Cir. 2012) ..........................................................................................25

*League of United Latin Am. Citizens v. Abbott,*
   604 F. Supp. 3d 463 (W.D. Tex. 2022)...........................................................................12

*League of Women Voters of the U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................................37

*Lomont v. O'Neill,*
   285 F.3d 9 (D.C. Cir. 2002) ..............................................................................................2

*Louisiana v. Becerra,*
   20 F.4th 260 (5th Cir. 2021) ...........................................................................................40

*Louisiana v. Biden,*
   55 F.4th 1017 (5th Cir. 2022) .........................................................................................37

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ........................................................................................................40

*Maracich v. Spears,*
   570 U.S. 48 (2013) ..........................................................................................................20

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ........................................................................................................11

*Memphis A. Philip Randolph Inst. v. Hargett,*
   978 F.3d 378 (6th Cir. 2020) ..........................................................................................36

*M-I LLC v. Argus Green LLC,*
   2010 WL 11527419 (E.D. Tex. July 13, 2010) ..................................................................37

*Miller v. Garland,*
   --- F. Supp. 3d ---, 2023 WL 3692841 (E.D. Va. May 26, 2023) ...................................... 13, 24, 25, 26

*Mistretta v. United States,*
   488 U.S. 361 (1989) ..........................................................................................................35

*Mock v. Garland,*
   --- F. Supp. 3d ---, 2023 WL 2711630 (N.D. Tex. Mar. 30, 2023) .................................... 12, 13, 18, 20

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................................................14

*Muscarello v. United States,*
   524 U.S. 125 (1998) ..........................................................................................................20

*N.A.A.C.P. v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010) .............................................................................................12

*N.Y. City Transit Auth. v. Beazer,*
   440 U.S. 568 (1979) ..........................................................................................................12

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ...................................................................................... 23, 25, 29, 31

*Nat'l Nutritional Foods Ass'n v. Mathews,*
   557 F.2d 325 (2d Cir. 1977) ..............................................................................................19

*Nat'l Rifle Ass'n v. Brady,*
   914 F.2d 475 (4th Cir. 1990) .............................................................................................13

*Nken v. Holder,*
   556 U.S. 418 (2009) ..........................................................................................................39

*Or. Firearms Fed'n, Inc. v. Brown,*
   --- F. Supp. 3d ---, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ........................................25

*Posters 'N' Things, Ltd. v. United States,*
   511 U.S. 513 (1994) ..........................................................................................................19

*Romag Fasteners, Inc. v. Fossil, Inc.,*
   140 S. Ct. 1492 (2020) ......................................................................................................17

*Second Amend. Found. v. ATF,*
   2023 WL 4304760 (N.D. Tex. June 30, 2023) ...................................................................39

*Sheffield v. Bush,*
　604 F. Supp. 3d 586 (S.D. Tex. 2022)........................................................................38

*Shenzhen Tange Li'An E-Com., Co. v. Drone Whirl LLC,*
　2020 WL 5237267 (W.D. Tex. Sept. 2, 2020)........................................................37

*Sig Sauer, Inc. v. Brandon,*
　826 F.3d 598 (1st Cir. 2016)............................................................................ 18, 19

*Sipes v. United States,*
　321 F.2d 174 (8th Cir. 1963)...................................................................................16

*Speech First, Inc. v. Fenves,*
　979 F.3d 319 (5th Cir. 2020)...................................................................................11

*Tex. Democratic Party v. Abbott,*
　961 F.3d 389 (5th Cir. 2020)...................................................................................32

*Touby v. United States,*
　500 U.S. 160 (1991) ................................................................................................34

*Trump v. Hawaii,*
　138 S. Ct. 2392 (2018) ............................................................................................40

*United States v. Al-Azhari,*
　2020 WL 7334512 (M.D. Fla. Dec. 14, 2020).......................................................24

*United States v. Brooks,*
　681 F.3d 678 (5th Cir. 2012) ...................................................................................31

*United States v. Cox,*
　906 F.3d 1170 (10th Cir. 2018) ................................................................... 23, 24, 26

*United States v. Davis,*
　139 S. Ct. 2319 (2019) ............................................................................................20

*United States v. Gilbert,*
　286 F. App'x 383 (9th Cir. 2008)............................................................................27

*United States v. Golding,*
　332 F.3d 838 (5th Cir. 2003) ...................................................................................26

*United States v. Gonzalez,*
　2011 WL 5288727 (D. Utah Nov. 2, 2011)............................................................27

*United States v. Hasson,*
　2019 WL 4573424 (D. Md. Sept. 20, 2019) ...........................................................24

*United States v. Hayes,*
   555 U.S. 415 (2009) ..................................................................................................18

*United States v. Howard,*
   766 F.3d 414 (5th Cir. 2014) ...................................................................................32

*United States v. Majid,*
   2010 WL 5129297 (N.D. Ohio Dec. 10, 2010) ......................................................27

*United States v. Perez-Gallan,*
   2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) ...................................................29

*United States v. Rose,*
   695 F.2d 1356 (10th Cir. 1982) ..............................................................................16

*United States v. Royce,*
   2023 WL 2163677 (D.N.D. Feb. 22, 2023)............................................................24

*United States v. Saleem,*
   2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ...................................................25, 29

*United States v. Santoro,*
   242 F. App'x 627 (11th Cir. 2007)..........................................................................16

*United States v. Schuhmann,*
   963 F.2d 381 (9th Cir. 1992) ..................................................................................16

*United States v. Syverson,*
   90 F.3d 227 (7th Cir. 1996) ....................................................................................18

*United States v. Thompson/Center Arms Co.,*
   504 U.S. 505 (1992) ......................................................................................2, 14, 16

*United States v. Williams,*
   553 U.S. 285 (2008) ................................................................................................33

*United States v. Zeidman,*
   444 F.2d 1051 (7th Cir. 1971) ................................................................................16

*Utility Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ................................................................................................21

*VanDerStok v. Garland,*
   625 F. Supp. 3d 570 (N.D. Tex. 2022) .............................................................36, 37

*Vill. of Hoffman Ests. v. Flipside Hoffman Ests., Inc.,*
   455 U.S. 489 (1982) ...........................................................................................33, 34

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ..................................................................................... 20, 21

*White v. Carlucci,*
    862 F.2d 1209 (5th Cir. 1989) ..................................................................................37

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ..................................................................................35

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ..................................................................................11

*Wis. Gas. Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ..................................................................................37

*Yakus v. United States,*
    321 U.S. 414 (1944) ..................................................................................36

**Federal Statutes**

18 U.S.C. §§ 921–931 ..................................................................................3

18 U.S.C. § 921 ..................................................................................*passim*

18 U.S.C. § 922 ..................................................................................3

18 U.S.C. § 923 ..................................................................................3

18 U.S.C. § 926 ..................................................................................4, 13

26 U.S.C. §§ 5801–5872 ..................................................................................2

26 U.S.C. § 5801 ..................................................................................3

26 U.S.C. § 5802 ..................................................................................3

26 U.S.C. § 5811 ..................................................................................3, 35

26 U.S.C. § 5812 ..................................................................................3, 35

26 U.S.C. § 5821 ..................................................................................3, 35

26 U.S.C. § 5822 ..................................................................................3, 35

26 U.S.C. § 5841 ..................................................................................1, 3, 35

26 U.S.C. § 5845 ..................................................................................*passim*

26 U.S.C. § 7801 ..................................................................................4, 13

26 U.S.C. § 7805 ...................................................................................................4, 13, 35

**State Statutes**

11 R.I. Gen. Laws Ann. § 11-47-8 ...........................................................................28

Ala. Code § 13A-11-63 ..............................................................................................28

Alaska Stat. Ann § 11.61.200 ....................................................................................28

Ariz. Rev. Stat. Ann. § 13-3101 ................................................................................28

Cal. Penal Code § 16590 ............................................................................................28

Colo. Rev. Stat. Ann. § 18-12-102 ............................................................................28

D.C. Code Ann. § 7-2502.02 .....................................................................................28

Fla. Stat. Ann. § 790.221 ...........................................................................................28

Ga. Code Ann § 16-11-121 ........................................................................................28

Ga. Code Ann § 16-11-122 ........................................................................................28

Haw. Rev. Stat. Ann. § 134-8 ....................................................................................28

Ill. Comp. Stat. Ann § 24-1 .......................................................................................28

Ill. Comp. Stat. Ann § 24-2 .......................................................................................28

Iowa Code Ann § 724.1C ...........................................................................................28

La. Stat. Ann. § 40:1785 ............................................................................................28

Md. Code Ann., Pub. Safety § 5-203 ........................................................................28

Mich. Comp. Laws Ann. § 750.224b .........................................................................28

Mo. Ann. Stat. § 571.020 ...........................................................................................28

Mont. Code Ann. § 45-8-340 .....................................................................................28

N.C. Gen. Stat. Ann. § 14-288.8 ...............................................................................28

N.D. Cent. Code Ann. § 62.1-02-03 ..........................................................................28

N.J. Stat. Ann. § 2C:39-1 ..........................................................................................28

N.J. Stat. Ann. § 2C:39-3 ..........................................................................................28

N.Y. Penal Law § 265.00 ..................................................................................................28

N.Y. Penal Law § 265.01-b ..............................................................................................28

Neb. Rev. Stat. Ann. § 28-1203 ........................................................................................28

Nev. Rev. Stat. Ann. § 202.275 ........................................................................................28

Ohio Rev. Code Ann. § 2923.17 .......................................................................................28

Okla. Stat. Ann. tit. 21, § 1289.18 ...................................................................................28

Or. Rev. Stat. Ann. § 166.272 ..........................................................................................28

S.C. Code Ann. § 16-23-250 .............................................................................................28

Tex. Penal Code Ann. § 46.05 ..........................................................................................28

Va. Code Ann. § 18.2-303.1 .............................................................................................28

Wash. Rev. Code Ann. § 9.41.190 ....................................................................................28

Wis. Stat. Ann. § 941.28 ...................................................................................................28

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954) .....................................................................................2, 16

**Regulations**

27 C.F.R. part 478 ........................................................................................................4, 13

27 C.F.R. § 478.11 ..............................................................................................8, 15, 17

27 C.F.R. part 479 ........................................................................................................4, 13

27 C.F.R. § 479.11 ..............................................................................................8, 15, 17

28 C.F.R. § 0.130 .........................................................................................................4, 13

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
    86 Fed. Reg. 30,826 (June 10, 2021) ...........................................................................8

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
    88 Fed. Reg. 6,478 (Jan. 31, 2023) .......................................................................*passim*

*Objective Factors for Classifying Weapons with "Stabilizing Braces,"*
    85 Fed. Reg. 82,516 (Dec. 18, 2020) ............................................................................8

*Objective Factors for Classifying Weapons With "Stabilizing Braces"; Withdrawal of Guidance,*
85 Fed. Reg. 86,948 (Dec. 31, 2020) ............................................................8

**Other Authorities**

2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822
(1823) ............................................................30

15 The Public Records of the Colony of Connecticut 191 (1890) ............................................................30

1775-1776 Mass. Acts 18 ............................................................30

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191,
(codified at Ark. Code. Ann. ch. 48 § 1498 (1894)) ............................................................30

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 ............................................................30

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25,
(codified at 1879 Tex. Crim. Stat. 24) ............................................................30

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352 ............................................................30

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27 ............................................................30

Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412 ............................................................31

Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59 ............................................................31

Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39 ............................................................30

Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175 ............................................................30

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210,
(codified at Kan. Gen. Stat. § 1003 (1901)) ............................................................30

Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231 ............................................................30

An Act About Powder Money, 1759-1776 N.H. Laws 63 ............................................................31

"An Act for the better regulating of the Militia of this Province,"
1747, McCord, *Statutes at Large*, 9:647 ............................................................30

An Act to License the Carrying of Fowling Pieces and other Fire-Arms,
1870 Haw. Sess. Laws 26 ............................................................30

An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this
State, § 1, 1890 S.C. Acts 653 ............................................................30

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890) ............................................................30

County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28 ............................................................31

IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961) .................................16

Joseph Abram Walker, The Revised Code of Alabama 169 § 10,
    (Reid & Screws, State Printers, 1867) ..............................................................................31

Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807
    (1807) ...............................................................................................................................30

Laws of the State of Maine 546 (1830) ....................................................................................30

Laws of the State of New Hampshire; with the Constitutions of the United States and of the
    State Prefixed 277 (1830) .................................................................................................30

*NFA Handbook* (Apr. 2009),
    https://perma.cc/P3NL-G35G ............................................................................................4

*Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196
    (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857).................30

Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34 .................................................................31

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early
    America: The Legal Context of the Second Amendment,"
    25 Law & Hist. Rev. 139 (2007) ........................................................................................30

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51,
    (James T. Mitchell & Henry Flanders comps. 1911) .........................................................31

## INTRODUCTION

For nearly a century, Congress has regulated the possession, manufacture, and distribution of short-barreled rifles, weapons that it determined were especially dangerous. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel shorter than 16 inches in length, it is a short-barreled rifle under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though stabilizing braces are frequently advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them to be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2023, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") promulgated a rule to clarify that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a stabilizing brace or similar device. *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"). And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a particular weapon configured with a brace device is designed, made, and intended to be fired from the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs are two firearms advocacy organizations who seek to preliminarily enjoin the Rule, but they fail to show any of the prerequisites to obtain that extraordinary relief. First, Plaintiffs are

1

unlikely to succeed on the merits of their claims. Congress empowered and obligated ATF to determine whether and when brace-equipped weapons become "rifles," as defined under federal law, and the Rule comports with the relevant statutory provisions and is reasonably explained. Moreover, the modest registration requirements that federal law impose do not violate the Second Amendment, and in any event, the right to bear arms does not protect the use of specific firearm modifications used to evade federal firearms laws. And merits aside, Plaintiffs have failed to demonstrate that they will suffer irreparable harm absent preliminary relief, and the requested injunction would undermine the public interest. The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I.      Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles— *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable

weapon" "likely to be used for criminal purposes.").[1] The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms

Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are

subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General

before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business

of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and

pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

    **2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–931, to

comprehensively regulate the manufacture and distribution of firearms and ammunition.

Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and

motivated by concerns that "the ease with which firearms could be obtained" had "contributed

significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. United

States*, 415 U.S. 814, 824 (1974), the GCA increased federal controls for persons engaging in the

business of importing, manufacturing, or dealing in firearms. *See, e.g.*, 18 U.S.C. §§ 922–923.

    Among these were specific controls on the interstate transport of "short-barreled rifles" and

the obligation of Federal Firearms Licensees ("FFL") to receive approval from the Attorney General

before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having

one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by

alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than

---

[1] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's. *Id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.    ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles* ("Commercial Guidance"), https://perma.cc/BK6C-BRGQ (providing images of weapons configured with common "brace" devices). And though manufacturers have nominally claimed that brace devices are meant to attach to or stabilize against a shooter's forearm, stabilizing braces often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a stabilizing brace falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3),

4

(4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a stabilizing brace (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. App'x to Pls.' Mot. for Prelim. Inj. ("App'x") at 10, ECF No. 12; 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. App'x at 10; 88 Fed. Reg. at 6,482. According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. 88 Fed. Reg. at 6,482. Based on its evaluation of the materials submitted, ATF concluded that the particular brace device, when configured with a pistol, would not convert that firearm into a weapon designed or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* at 6,483. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of stabilizing braces of varying designs. *Id.* at 6,479. But unlike the 2012 prototype, these newer brace designs began to include characteristics common to shoulder stocks. *Id.*; *see also, e.g., id.* at 6,528–29 (comparing two stabilizing braces to similarly designed shoulder

stocks); *id.* at 6,528 (noting that a manufacturer listed a stabilizing brace as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some stabilizing braces were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g., id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546–47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different brace devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a brace device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a brace device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters (and a 2015 Open Letter) suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the stabilizing brace, as either a device assisting single-handed fire or shoulder fire. *Id.* at 6,484, 6,487–88. ATF also occasionally focused on the brace device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several brace-equipped weapons as short-barreled rifles after considering, *e.g.*, whether the brace device served any purpose other than to extend the rear surface to enable shouldering, *id.* at 6,485, or whether the device created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel brace-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's

incidental use of the firearm. *Id.* at 6,491. In 2018, ATF informed classification requestors that, to properly evaluate how a brace device affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the brace device attached. *Id.* at 6,492.

By mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 brace device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a stabilizing brace as a short-barreled rifle after applying the same analytical framework. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the same company). Notably, neither manufacturer sued to challenge these classifications.

## III.   The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling brace devices as "ATF compliant" without having submitted the particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using brace devices to create short-barreled rifles

without complying with NFA requirements, *id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *supra* p. 2.

In March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a stabilizing brace opened fire at a supermarket in Boulder, Colorado, killing ten people, including an on-duty police officer. This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual similarly armed with an AR-type pistol equipped with a stabilizing brace killed nine people and injured 17 others within approximately 30 seconds from firing the first shot. [2] In both instances, the shooters reportedly used the brace devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.

**2.** In light of its pre-existing concerns, as well as these violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of weapons equipped with stabilizing braces. *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. 86 Fed. Reg. 30,826. [3] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made, and intended to be fired from the shoulder, including weapons equipped with stabilizing braces or other similar attachments. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

ATF announced the rule on January 13, 2023, and it was published in the Federal Register on January 31, 2023, 88 Fed. Reg. at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–6,569, contains the following key provisions:

---

[2] CNN, *10 killed in Colorado grocery store shooting*, https://perma.cc/HG5S-3NAF; USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole*, https://perma.cc/89XK-SNVR.

[3] In December 2020, ATF published a notice of proposed rulemaking, *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516 (Dec. 18, 2020), but withdrew it weeks later, 85 Fed. Reg. 86,948 (Dec. 31, 2020).

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a stabilizing brace) that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–13—are:

(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with stabilizing braces, including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. For example,

an individual who was an unlicensed possessor of a brace-equipped short-barreled rifle before the Rule was published has until May 31, 2023, to come into compliance with the NFA by:

(i)    filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;

(ii)   removing the firearm from the definition of "short-barreled rifle," 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the "brace" device so that it cannot be reattached to the weapon;

(iii)  turning the firearm into a local ATF office; or

(iv)   destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

*Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for persons who possessed short-barreled rifles equipped with stabilizing braces prior to the Rule's publication. *Id.* at 6,571. Individual possessors, for instance, will not be subject to the $200 making tax so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

*Rescission of prior classifications.* As a final matter, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of firearms equipped with stabilizing braces. *Id.* at 6,480. These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[4]

## IV.    This Lawsuit

Two firearms advocacy groups filed this lawsuit on June 8, 2023—more than four months after ATF promulgated the Rule—claiming, *inter alia*, that the Rule is unconstitutional and otherwise

---

[4] ATF also issued additional guidance in conjunction with the Rule's announcement, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of commercially available firearms and common weapon platforms equipped with "stabilizing braces" that ATF has determined are short-barreled rifles under the NFA and the GCA. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

violates the Administrative Procedure Act ("APA"). Verified Compl. ("Compl.") ¶¶ 52–111, ECF No. 1. A week later, they moved to preliminarily enjoin ATF from enforcing the Rule. Pls.' Br. in Supp. of Mot. for a Prelim. Inj. ("Mot."), ECF No. 11.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). Failure to demonstrate any one of these elements requires denial of preliminary relief. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

## ARGUMENT

I.      **Plaintiffs are unlikely to succeed on the merits of their claims.**

      a.      **Plaintiffs lack standing.**

"A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020); *see also Enter. Int'l Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 470–71 (5th Cir. 1985) ("Before a trial court may validly enter a preliminary injunction," a plaintiff must establish a likelihood of "success upon the question of jurisdiction."). At this stage, where Texas Gun Rights, Inc. ("TGR") and National Association for Gun Rights Inc. ("NGR") seek a preliminary injunction on behalf of their purported members, they "must clearly show that [they] likely ha[ve] *associational* standing to bring [their] case on the merits." *Speech First*, 979 F.3d at 330. To demonstrate associational standing, a membership organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (citation omitted). Plaintiffs have failed to satisfy the first prerequisite.

As the Fifth Circuit has explained, to demonstrate standing "when seeking an injunction, the organization must show an individual who has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) (cleaned up). In other words, the organization is required to "identify" at least one member that has standing to sue on his or her own behalf. *Id.* at 344 (citation omitted); *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (holding group lacked standing in part because there was "no evidence in the record showing that a specific member" was injured). Here, while TGR and NGR seek a preliminary injunction on behalf of their members, neither group identifies a single member who has been harmed or will imminently suffer injury caused by the challenged Rule. Under binding Fifth Circuit precedent, both plaintiff organizations fail to demonstrate standing, and their motion for a preliminary injunction should be denied on this ground alone. *See Funeral Consumers All.*, 695 F.3d at 344 ("An organization lacks standing if it fails to . . . identify even one individual member with standing." (cleaned up)); *see also League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 485 (W.D. Tex. 2022) ("Without identifying its members or their injuries, [plaintiff group] cannot have associational standing."); *Itserve All., Inc. v. Nielsen*, 2019 WL 2539240, at *4 (N.D. Tex. Feb. 11, 2019) (holding plaintiff lacked standing in part because it failed "to identify any individual member company that was injured or faces imminent injury").

### b.     The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions.

Plaintiffs claim that ATF lacked authority to promulgate the Rule because the Rule "redefine[d]" the statutory definition of "rifle." Mot. at 13–15; Compl. ¶¶ 53–59. But the Rule fits squarely within ATF's delegated authority and correctly construes the relevant statutory provisions. Plaintiffs' arguments, on the other hand, misconstrue the Rule and rest largely on bare assertions that, in any

event, are contrary to basic principles of statutory construction.[5] Indeed, this Court recently rejected similar arguments in denying a motion to preliminarily enjoin the Rule's enforcement in a related case, *see Mock v. Garland*, --- F. Supp. 3d ---, 2023 WL 2711630, at *4 (N.D. Tex. Mar. 30, 2023), as did the U.S. District Court for the Eastern District of Virginia, *see Miller v. Garland*, --- F. Supp. 3d ---, 2023 WL 3692841, at *3–4 (E.D. Va. May 26, 2023).

**1.** As a threshold matter, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. 27 C.F.R. parts 478, 479. Like any executive actor charged with enforcing a statute, the agency has found it necessary to issue rules interpreting terms used in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret" statutes "Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established, as this Court has recognized. *Mock*, 2023 WL 2711630, at *4; *accord, e.g.*, *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019). Indeed, ATF has maintained regulations for decades that clarify the meaning of statutory terms that Congress did not fully define. *See* 88 Fed. Reg. at 6,500 (collecting examples). And consistent with this

---

[5] Before reaching Plaintiffs' constitutional challenges to the Rule, the Court should first address their other contentions. *See, e.g.*, *N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979).

longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The need for this Rule cannot be gainsaid. 26 U.S.C. § 7805(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) ("[Section 926] confers [a] measure of discretion" to ATF "to determine what regulations are in fact 'necessary.'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *Thompson/Center*, 504 U.S. at 517. A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having one or more barrels less than [16] inches in length." 18 U.S.C. § 921(a)(8); 26 U.S.C. § 5845(a)(3). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if this definition is met.

Then the stabilizing brace arrived and quickly proliferated. As explained, *supra* pp. 5–6, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of brace devices, as the need for ATF to determine these weapons' classifications was clear to manufacturers from the start. While stabilizing braces are purportedly meant to assist single-handed fire by resting against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a stabilizing brace, it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *Id.* at 6,493–94, 6,529; *FINAL RULE 2021R-08F*, at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various brace devices to convert heavy pistols into shoulder-fired weapons, and

14

individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used brace-equipped firearms to carry out mass shootings. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations, 27 C.F.R. §§ 478.11, 479.11, to provide a consistent, predictable framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule explains that a weapon equipped with a stabilizing brace may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with brace device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule explains, *id.* at 6,513–43, ATF's expertise and years of experience in classifying brace-equipped weapons informs these criteria. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021). The Rule therefore rests on ATF's well-established authority and is consistent with its longstanding practice of issuing rules to clarify its understanding of the meaning and proper application of statutory terms.

**2.** Plaintiffs nonetheless contend that the Rule "conflicts" with the statutory definition of "rifle." Mot. at 13. But Plaintiffs offer no serious interpretive analysis to support that claim. Nor do they articulate any better interpretation of the relevant statutory provisions. At any rate, their arguments do not comport with the statute's text or purpose, prior judicial constructions, or any canon of construction that they invoke. The Rule, on the other hand, reaches the correct conclusion: that a

pistol equipped with a "stabilizing brace" can be a "rifle," and thus a short-barreled rifle, within the meaning of the NFA and the GCA.[6]

Start with two points that Plaintiffs cannot dispute. *First*, a pistol can be modified into a "rifle" within the meaning of § 5845(c) and § 921(a)(7). That is clear not only from the statutory text, which uses the broad and inclusive term "weapon," but also from the Supreme Court's reasoning in *Thompson/Center*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (quoting 26 U.S.C. § 5845(c)); *accord id.* at 523 (White, J., dissenting); *id.* at 525 (Stevens, J., dissenting). Lower courts have likewise applied that same reasoning. *E.g.*, *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007). As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as a component part, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder.[7]

*Second*, the fact that a weapon may be designed to *also* allow effective single-handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. Many litigants have argued that the definition of "rifle" should be limited only to

---

[6] Plaintiffs' argument that the agency is not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), does not advance their claim: This Court's review is *de novo*, the Rule reflects the best interpretation of the statutes, and neither the agency nor the government in this litigation relies on *Chevron* deference.

[7] That is why even those weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *See, e.g.*, *Kanarr Corp. v. United States*, 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *United States v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis with collapsible stocks). The NFA's legislative history also supports this understanding. When Congress enacted the statutory definition of "rifle" in 1954, a House committee report confirmed that the definition was intended to replace reliance on "ordinarily accepted definitions" in determining whether a particular weapon is an NFA "rifle." H.R. Rep. No. 83-1337, at A395. ATF also has long recognized that pistols can be modified to fall within the NFA's definition of "rifle." *See, e.g.*, IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961).

weapons designed and intended to fire *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *E.g.*, *Rose*, 695 F.2d at 1357–58; *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. U.S.*, 321 F.2d 174, 178 (8th Cir. 1963) ("That" a weapon "could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition."), *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57. As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a stabilizing brace that it is designed, made, and intended to be fired from the shoulder is a "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. 88 Fed. Reg. at 6,501.[8]

Plaintiffs contend, however, that the Rule departs from the statutory text by including within the definition of "rifle" weapons that are merely capable of being fired from the shoulder. Mot. at 12, 15. That's incorrect. Nowhere does the Rule suggest that the mere ability to shoulder a weapon is sufficient to satisfy the statutory definition of "rifle." Indeed, if that were the case, ATF would need to consider only whether a weapon possesses surface area that allows it to be shoulder fired. But that is only part of the analysis. *See* 27 C.F.R. §§ 478.11, 479.11. To determine whether a brace-equipped weapon is a "rifle," ATF also requires that "other factors, as listed in the [R]ule, indicate that the weapon is designed, made, and intended to be fired from the shoulder," 88 Fed. Reg. at 6,569—the focal inquiry under the statutory definition of "rifle," 26 U.S.C. § 5845(c).

Even so, Plaintiffs insist that pistols configured with stabilizing braces are categorically designed and intended for single-handed fire, not shoulder fire, and thus cannot be "rifles" under the NFA or the GCA. Mot. at 12, 15; Compl. ¶ 57. But the factual record before ATF belies that assertion, 88 Fed. Reg. at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47, and Plaintiffs offer no evidence to

---

[8] Indeed, the opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is not found in the statutory text. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there.").

support it. Instead, Plaintiffs appear to reach that counterfactual conclusion by relying on manufacturers' descriptions of brace-equipped weapons as determinative of their design and intended use. *See, e.g.*, Mot. at 3–4 (citing a manufacturer's description of the first stabilizing brace prototype and suggesting that all brace devices share the same general design and intended use); Compl. at 19–23. But while a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) lead to absurd results, and (iii) permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. *Id.* at 6,544; *see also United States v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting an interpretation that "would frustrate Congress' manifest purpose" and mean the statute was a dead letter in many applications). Indeed, if a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the stock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule explains. 88 Fed. Reg. at 6,544.

Therefore, as this Court held in *Mock*, to properly apply the statutory definition of "rifle," ATF is "necessarily require[d]" to consider a particular weapon's objective design features, in addition to a manufacturer's description of the weapon in marketing materials and information indicating its likely use, for purposes of determining whether the weapon is designed and intended to be fired from the shoulder. 2023 WL 2711630, at *4; *see also* 88 Fed. Reg. at 6,501. And in this particular context, where the record shows that manufacturers' descriptions of brace-equipped weapons are often at odds with the weapons' design features and common use, *id.* at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47, this objective approach is especially sensible.

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598

(1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g.*, *United States v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court found it "hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent—like ATF's approach—"is a very familiar one in the law," *id.* at 601, as recognized in analogous contexts, *e.g.*, *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 517–22 (1994) (adopting an objective construction of the phrase "primarily intended . . . for use").[9]

And, aside from a weapon's objective design features, ATF also considers other evidence of the weapon's intended use. These include, *inter alia*, the "manufacturer's own marketing materials," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general community's likely use of a particular weapon, if it evinces the manufacturer's intent with regard to that weapon. 88 Fed. Reg. at 6,544. Courts also have long relied on this type of evidence to discern intent in numerous contexts. *See, e.g.*, *Posters 'N' Things*, 511 U.S. at 521 n.11 (noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use"). In sum, ATF evaluates a weapon's objective design features and other objective evidence—rather than relying solely on a manufacturer's

---

[9] *See also, e.g.*, *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017).

description of the weapon—to answer the key statutory inquiry: whether a weapon is designed, made, and intended to be fired from the shoulder, *see* 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

**3.** Without help from traditional tools of interpretation, Plaintiffs invoke the rule of lenity, Mot. at 24, a principle of statutory construction providing that ambiguities within "a criminal statute should be resolved in the defendant's favor," *United States v. Davis*, 139 S. Ct. 2319, 2333 (2019). The rule of lenity applies, however, only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (citation omitted). But the statutory provisions at issue here contain no grievous ambiguity for the rule of lenity to resolve, and Plaintiffs argue nothing to the contrary. *Muscarello v. United States*, 524 U.S. 125, 138 (1998) ("[S]ome statutory ambiguity . . . is not sufficient to warrant the application of [the] rule, for most statutes are ambiguous to some degree."). As already explained, *supra* pp. 15–20, traditional tools of statutory interpretation firmly support the Rule's application of the statutory definition of "rifle" to weapons equipped with stabilizing braces where such weapons are designed, made, and intended to be fired from the shoulder.[10] *See Mock*, 2023 WL 2711630, at *6 (rejecting reliance on the rule of lenity).

**4.** Finally, Plaintiffs' reliance on the "major questions doctrine," Mot. at 11–13, is similarly misplaced. *First*, that doctrine applies only "in certain extraordinary cases" that involve "decisions of vast economic and political significance" or assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022). But the Rule—

---

[10] Plaintiffs' citation to *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), does not advance their argument. There, the court determined that the definition of "machinegun" under 26 U.S.C. § 5845(b) was "plain" and "unambiguous," *id.* at 451, 464, obviating any need to resort to the rule of lenity. The court nonetheless proceeded to discuss how lenity would apply assuming that § 5845(b) was so ambiguous as to "provide [no] meaningful guidance" and to require the court to "'guess' at its definitive meaning." *Id.* at 469. But as already explained, no such grievous ambiguity exists in the statutory provisions challenged here.

which interprets the statutory definition of "rifle" as it relates to federal firearms classifications, ATF's wheelhouse—bears none of these features, either as a matter of reach or impact.

*Second*, Plaintiffs neglect to mention that major-questions principles are relevant only when an administrative action involves a "novel" or "unprecedented" interpretation of regulatory authority involving "ancillary" statutory provisions. *See West Virginia*, 142 S. Ct. at 2605; *accord Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (considering whether the challenged action represents an "enormous and transformative expansion in [the agency's] regulatory authority"). But nothing of the sort happened here. For over half a century, ATF has exercised delegated authority in issuing rules interpreting the meaning of terms within the NFA and the GCA. Consistent with that longstanding practice, the Rule simply amends existing regulations to clarify for the regulated community ATF's understanding of the proper application of one specific statutory phrase. That can hardly be described as an "enormous and transformative expansion [in the agency's] regulatory authority," *see Utility Air Regul. Grp.*, 573 U.S. at 324, that rests on an "ancillary provision," *see West Virginia*, 142 S. Ct. at 2605.

*Third*, before applying major-questions principles, the Supreme Court has considered whether the challenged action is within the agency's traditional field of expertise, *see West Virginia*, 142 S. Ct. at 2612–13, whether it intrudes on matters typically governed by state law, *id.* at 2606, and whether Congress has expressly considered and rejected the measure in the past, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000). None of these factors is present here, and Plaintiffs do not argue to the contrary.

### c.   The Rule is reasonable.

Plaintiffs next argue that the Rule must be set aside as arbitrary and capricious. "The arbitrary and capricious standard is 'highly deferential,' and [courts] must afford the agency's decision 'a presumption of regularity.'" *Hayward v. U.S. Dep't of Lab.*, 536 F.3d 376, 379 (5th Cir. 2008) (citation omitted). When an agency changes its position, it must "provide [a] reasoned explanation for its

21

action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This "ordinarily demand[s] that [the agency] display awareness that it *is* changing position"; however, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.*; *cf. Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (holding that a rule was arbitrary and capricious when agency "said almost nothing" regarding "the good reasons for the new policy" (cleaned up)).

Plaintiffs contend that ATF has failed to acknowledge and provide a reasoned explanation for its change. *See* Mot. at 17–18. They are wrong on both counts.

First, the Rule readily acknowledges that it represents a change from ATF's past approach. *See* 88 Fed. Reg. 6,479–81. In response to comments criticizing the proposed rule as "flip flop" by ATF, the Rule explicitly states that the "Department acknowledges that this rule is a change in position from some of ATF's previous classifications or positions." *Id.* at 6,501–02. The Rule also provides a thorough and reasoned explanation for this change: As ATF explains in multiple places and in multiple ways, "it is necessary for the Department to issue this rule to clarify the statutory definition of 'rifle'" as well as "to inform the public of the best interpretation of the definition" to "guide the proper legal and factual analysis to be conducted in evaluating whether a firearm is designed, made, and intended to be fired from the shoulder." *Id.* at 6,502; *see also id.* ("[T]he intent of this rule is to resolve prior inconsistencies and ensure consistent application of the statutory definition of 'rifle' to firearms equipped with 'stabilizing braces[.]'"); *id.* at 6,481 (describing the benefits of the Rule: it "prevent[s] manufacturers and individuals from violating the requirements of the NFA and GCA" and "enhances public safety by reducing the further proliferation and criminal use of firearms with attached 'stabilizing braces.'"). Additionally, ATF's analysis walks through ATF's previous classifications, explains how stabilizing brace designs have changed over the past decade, summarizes the agency's rulemaking process, and responds to public comments, thereby providing a

22

detailed explanation why the Rule is better than the agency's previous approach. *See id.* at 6,482–6,569; *see also Encino Motorcars*, 579 U.S. at 221 (explaining that agency action is not arbitrary and capricious if agency explanation is "clear enough that its path may reasonably be discerned" (citation omitted)). Thus, Plaintiffs' arguments are unfounded, and ATF's 98-page Rule is not arbitrary and capricious.

### d. The Rule does not infringe on the right to bear arms.

Plaintiffs are unlikely to succeed on the merits of their Second Amendment challenges for at least four reasons. *First*, stabilizing braces are not "bearable arms," and thus Plaintiffs lack a Second Amendment right to use them. *Second*, the NFA's basic registration requirements do not implicate the right to bear arms. *Third*, short-barreled rifles are dangerous and unusual weapons that do not enjoy Second Amendment protections. *And fourth*, even if the Rule and the NFA implicated the right to bear arms, they are supported by a robust history and tradition of firearm regulations.

1. Firearm braces are not bearable arms protected by the Second Amendment.

Under *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Second Amendment extends only to "instruments that constitute bearable arms." *Id.* at 582; *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). Indeed, "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an 'Arm.'" *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (cleaned up); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Consistent with this requirement, *Heller* explained that the historical understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581.

Because the Second Amendment protects only the right to use "bearable arms," laws that regulate the use of firearm "accessories" or "attachments" do not generally impinge on that right. For instance, the NFA requires registration and payment of a $200 tax—the same requirements for a

A

short-barreled rifle—when making a firearm equipped with a "silencer."[11] Courts have uniformly held that because a "silencer is a firearm accessory . . . it can't be a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *accord United States v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020). Indeed, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm," and "a firearm remains an effective weapon without a silencer" attached. *United States v. Hasson*, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019) (collecting cases).

Stabilizing braces fall outside the scope of the Second Amendment for the same reasons. In fact, Plaintiffs repeatedly concede that a stabilizing brace is not a bearable arm but rather an "accessory." *See, e.g.,* Compl. ¶ 19 ("A stabilizing brace is an accessory that can be installed on a pistol."); *id.* ¶ 76 ("[S]tabilizing braces are lawful accessories . . . ."). The parties thus appear to agree that these devices are not weapons or arms and serve no useful purpose except as attachments to firearms. And, in rejecting a similar challenge to the Rule, the court in *Miller* agreed that the Second Amendment is not implicated because "a stabilizing brace cannot cause harm on its own, is not useful independent of its attachment to a firearm, and a firearm remains an effective weapon without a brace." 2023 WL 3692841, at *10. Attaching a firearm accessory like a brace to a weapon is thus "not protected by the Second Amendment." *See United States v. Royce*, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023). Plaintiffs' Second Amendment claim fails for this reason alone.

2. Registration of short-barreled rifles does not implicate the Second Amendment.

The Rule does not ban any firearms; rather the NFA (and thus the Rule) permits possession of short-barreled rifles upon registration with, and approval by, ATF. Although Plaintiffs raise a Second Amendment claim, Mot. at 9, they fail to explain what requirement of the NFA or the Rule is

---

[11] "Silencer" is defined as, *inter alia*, "any device for silencing, muffling, or diminishing the report of a portable firearm." 18 U.S.C. § 921(a)(25).

unconstitutional. In fact, Plaintiffs concede that they may lawfully possess their firearms subject to certain "registration and tax requirements." *Id.* at 10.

Routine firearm registration procedures, like those required here, do not offend the right to bear arms. As the Fifth Circuit has explained, requirements that are part and parcel of the NFA (*e.g.*, being "photographed and fingerprinted") implicate no legally protected interest, but are "merely additional costs and logistical hurdles that all citizens" must bear. *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017) (cleaned up); *accord Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, and distinguishing laws imposing "minor inconveniences" from those effecting "an absolute deprivation" of the right to bear arms). And the court in *Miller* agreed that the Rule does not violate the Second Amendment in part because the "Second Amendment does not prohibit the imposition of reasonable licensing regimes commonly associated with firearm ownership." 2023 WL 3692841, at *11.

Indeed, Justice Kavanaugh (in an opinion joined by the Chief Justice) reiterated in *Bruen* that 43 states employ concealed-carry licensing regimes that may demand "objective licensing requirements," like "fingerprinting, a background check, a mental health records check," none of which violates the Second Amendment. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And the Court took pains to note this point, as well. *Id.* at 2138 n. 9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of these licensing regimes). Likewise, the NFA's registration procedures (*e.g.*, fingerprinting and background checks) pose no constitutional problem under *Bruen*. *See, e.g.*, *United States v. Saleem*, 2023 WL 2334417, at *11 n. 9 (W.D.N.C. Mar. 2, 2023) (noting that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"); *Or. Firearms Fed'n, Inc. v. Brown*, --- F. Supp. 3d ---, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (upholding under *Bruen* a state's firearms permit requirement that includes a "background check, fingerprinting, a mental health check," etc.).

25

Nor can Plaintiffs show the extraordinary circumstances left open by the Court in *Bruen*, in which otherwise constitutional licensing may still infringe on the Second Amendment because of "lengthy wait times" or "exorbitant fees" that effectively "deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. The length of time required for registration here is irrelevant to Plaintiffs' Second Amendment claim, because if Plaintiffs' members submitted their applications on or before May 31, 2023, they were able to retain possession of their firearms until they receive ATF's response on the application. 88 Fed. Reg. at 6,559. Moreover, the Rule imposed no tax on Plaintiffs' members if their applications were timely filed. Plaintiffs thus fail to demonstrate that registration offends the Second Amendment.

> 3. Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment.

The Rule does not implicate the Second Amendment for another reason: there is no right to bear dangerous and unusual arms like short-barreled rifles. *See Heller*, 554 U.S. at 625 (explaining that the Second Amendment, as historically understood, does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns"); *see also Miller*, 2023 WL 3692841, at *11 (agreeing that "short-barreled rifles are not protected under the Second Amendment because like short-barreled shotguns, they are dangerous and unusual weapons").

The Fifth Circuit in *Hollis* outlined the proper analysis for determining when a weapon (a machinegun, in that case) is "dangerous and unusual" and thus unprotected by the Second Amendment. 827 F.3d at 451. In evaluating dangerousness, the court looked to Circuit precedent holding that the unlawful possession of a machinegun constitutes a crime of violence for purposes of a sentence enhancement. *Id.* at 449. That same precedent explains that the same conclusion applies to all NFA firearms, including short-barreled rifles. *United States v. Golding*, 332 F.3d 838, 843 (5th Cir. 2003). The court also relied on decisions from other courts holding that machineguns are dangerous weapons outside the Second Amendment's ambit. *Hollis*, 827 F.3d at 448. As with machineguns, courts

have uniformly agreed that the inherent dangerousness of short-barreled rifles places them beyond constitutional protections. *E.g.*, *Cox*, 906 F.3d at 1185; *see also* 88 Fed. Reg. at 6,499 (noting that short-barreled rifles "are dangerous and unusual due to both their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy").[12]

*Hollis* also analyzed what it means for a firearm to be "unusual." On this score, the court looked to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which suggested that the evaluation involves, at the very least, looking to the "absolute number" of weapons at issue "*plus*" the number of states where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50. Here, assuming that there are now approximately 3.6 million short-barreled rifles in the United States (641,000 previously registered short-barreled rifles and 3 million with stabilizing braces), that falls far short of the numbers in *Hollis. Id.* (comparing numbers of machine guns to "50 million large-capacity magazines" in use, or the "more than 8 million AR- and AK-platform semi-automatic rifles"). Moreover, *Hollis* also recognized that "[p]ercentage analysis may also be relevant," in evaluating the relevant proportion of firearms. *Id.* at 450. Conservatively estimating that there are 400 million civilian-owned firearms in the United States,[13] the number of short-barreled rifles is less than one percent of this amount (0.9%). Where, as here, the relative number and percentage of firearms at issue is "quite low," *see id.*, there is little question that the weapon at issue is unusual.

Additionally, *Hollis* rejected the argument that the "number [of firearms] by itself was sufficient" to determine "usualness." *Id.* The court also looked to the number of states where

---

[12] *E.g.*, *United States. v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008); *United States v. Gonzalez*, 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011); *United States v. Majid*, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

[13] Wash. Post, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, https://perma.cc/LNE7-8TZQ. The number is likely far higher than 400 million, as consumers have purchased nearly 20 million firearms *per year* in recent years. Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record*, https://perma.cc/TVS8-NNVW.

machineguns could be "lawfully possessed," including states that banned them entirely and states that banned them unless possessed legally "under federal law." *Id.* With 34 states prohibiting machinegun possession, the court found this to be further support that machineguns are unusual. *Id.* There are a similar number of state laws concerning possession of short-barreled rifles: at least 30 states and the District of Columbia ban short-barreled rifles outright or unless registered under the NFA.[14] Like in *Hollis*, these laws further show that short-barreled rifles are dangerous. Consequently, such firearms "do not receive Second Amendment protection," *id.* at 451, and no additional "historical inquiry," Mot. at 13, is required to reject Plaintiffs' claim.

4.    Historical tradition of regulation supports the Rule and the NFA.

While the Rule does not implicate the Second Amendment, even if it did, the Rule and the NFA are constitutional because they rest upon centuries of similar taxation and registration requirements. Plaintiffs fault ATF for not providing a historical analysis in the Rule, and contend that the absence of such an inquiry at the administrative level constitutes an independent error of the "rulemaking process." Mot. at 11. But APA review mandates only that an agency "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (citation omitted). The Rule provided a detailed response to commenters who raised Second Amendment concerns, explaining the agency's position that "weapons regulated by the NFA, such as short-barreled rifles, fall outside the scope of the Second Amendment" because

---

[14] *See* Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Cal. Penal Code § 16590; Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); D.C. Code Ann. § 7-2502.02; Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann § 16-11-122, 16-11-121(4); Haw. Rev. Stat. Ann. § 134-8; Ill. Comp. Stat. Ann § 24-1(a)(7)(ii), § 24-2(c)(7); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); 11 R.I. Gen. Laws Ann. § 11-47-8(b); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

they are "dangerous and unusual." 88 Fed. Reg. at 6,548. This discussion of the Second Amendment plainly satisfies ATF's obligations under the APA. *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (holding that an agency's response to public comments should indicate "what major issues of policy were ventilated" and "why the agency reacted to them as it did").[15]

    In any event, even if the Court disagrees as to whether short-barreled rifles are dangerous and unusual weapons, the Rule remains constitutional under any fair reading of the historical record. Where a regulation implicates the Second Amendment, the Government may justify the regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Government may do so by pointing to "a well-established and representative historical *analogue*." *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar"—*i.e.*, they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. But there need not be "a historical *twin*." *Id.* This analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where it is important to remember that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Id.* at 2132.

    From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements. Indeed, colonial and early state governments regularly sought to gather information regarding firearm ownership in their jurisdiction. As early as 1631, Virginia required a

---

[15] Moreover, Plaintiffs point to no case holding that an agency must conduct a historical analysis in promulgating a rule or regulation concerning firearms. *Cf. United States v. Perez-Gallan*, 2022 WL 16858516, at *13 (W.D. Tex. Nov. 10, 2022) (noting that the Government might, in court, "develop[] an in-depth historical analysis to uphold a regulation"). Nor was ATF required to evaluate the history of firearm regulations, given that the agency correctly concluded that "short-barreled rifles are dangerous and unusual weapons that fall outside the scope of the Second Amendment." 88 Fed. Reg. at 6,548; *see Saleem*, 2023 WL 2334417, at *11 (explaining that where "the Second Amendment's plain text does not protect [certain] conduct" a court "need not reach the historical inquiry").

regular survey of people in the colony and "also of arms and munition," and door-to-door surveys of firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[16] Similarly, militia members in Massachusetts (1775) were required to have their firearms inspected, with an official record documenting all such inspections, and New York (1778) imposed similar requirements.[17] In 1805, Massachusetts required that all musket and pistol barrels manufactured in the state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment of a fee, to insure their safe condition, and Maine enacted similar requirements in 1821.[18] Licenses or inspection were also required in certain states to export or sell gunpowder (akin to modern ammunition), such as in Massachusetts (1651, 1809), Connecticut (1775), and New Hampshire (1820).[19] South Carolina authorized the issuance of licenses for the sale of pistols (1890).[20] And personal firearm licenses for sporting purposes were required in Hawaii (1870) and Wyoming (1899).[21]

---

[16] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175; *Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43. *See also* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).

[17] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.

[18] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).

[19] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

[20] An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653. Arkansas (1881) prohibited the sale or exchange of most pistols. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)). Other states also enacted prohibitions on or other restrictions on the carrying of pistols. *See* Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231.

[21] An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

Further, while individual plaintiffs are exempt from the NFA's tax, it is supported by multiple historical statutes. In 1759, for instance, New Hampshire required that certain ships pay a tax of money or gunpowder.[22] Taxes on firearms specifically were also common through the 19th century. Indeed, taxes were specifically levied on pistols, and in certain cases other firearms, in Alabama (1867), Mississippi (1844, 1867), North Carolina (1857), and Georgia (1866).[23]

Taken together, these laws reflect an unbroken historical tradition of American firearm regulation "relevantly similar" to that required by the NFA. *See Bruen*, 142 S. Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the NFA and its corresponding regulations seek to raise revenue through taxation, regulate but do not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Thus, any modest burden imposed by the NFA's regulations is certainly "comparable" and "comparably justified" to the numerous historical laws listed above.

###### e.      The Rule is not vague.

Next, Plaintiffs challenge the Rule as unlawfully vague. Mot. at 18. As an initial matter, courts "consider whether a statute is vague as applied to the particular facts at issue," *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), and Plaintiffs challenge fails, if for no other reason, because they have improperly asserted only that the Rule is vague in the abstract, and not as applied to the facts of their case, *see* Mot. at 18; *see also United States v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012).

Regardless, the Rule is not unconstitutionally vague. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary

---

[22] An Act About Powder Money, 1759-1776 N.H. Laws 63; Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

[23] Joseph Abram Walker, The Revised Code of Alabama 169 § 10, (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Howard*, 766 F.3d 414, 428 (5th Cir. 2014) (quoting same). "A statute is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (citations omitted). However, "perfect clarity and precise guidance have never been required." *Holder*, 561 U.S. at 19 (citations omitted).

Plaintiffs take issue with each step of the Rule's two-part analysis, asserting that, at step one, whether there is "surface area" that "allows the weapon to be fired from the shoulder," is vague because the straightforward term "surface area" is not defined, and at step two, ATF's factoring criteria looks at "subjective information." Mot. at 18. But Plaintiffs' arguments fail because the Rule's two-part framework is sufficiently definite that ordinary people can understand what it requires. *First*, although the Rule does not define "surface area," that term is commonly used and understood by people of ordinary intelligence. *See, e.g.*, "*Surface Area*," *Merriam-Webster's Online Dictionary* (2023), https://perma.cc/8XTR-UD2L ("[T]he amount of area covered by the surface of something."). And, when considered in context, it is evident that "surface area" refers to an area at the rear end of a weapon that permits it to be shouldered like a traditional rifle. *See* 88 Fed. Reg. 6,529 ("Under the final rule, any device or extension on the rear of the firearm that provides any surface area that allows for the shouldering of the weapon is to be considered first[.]"); *see also JetPay Corp. v. IRS*, 26 F.4th 239, 241–42 (5th Cir. 2022) ("[W]ords . . . must be read in their context and with a view to their place in the overall statutory scheme."). The Rule includes dozens of pictures and graphics illustrating the surface area the Rule is concerned with—clarifying any remaining ambiguity. *See* 88 Fed. Reg. 6,523–29 (photos and graphics comparing rear-end surface area of traditional rifles, weapons equipped with stocks, and weapons equipped with stabilizing braces).

*Second*, the objective design features considered at step two pose no problem. Courts have clarified that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather, the indeterminacy of precisely what that fact is," and courts have struck down statutes tying criminal culpability to "wholly subjective judgments," such as whether conduct is "annoying" or "indecent." *United States v. Williams*, 553 U.S. 285, 306 (2008); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). Here, the factoring criteria are not indeterminate and instead present "clear questions of fact." *Williams*, 553 U.S. at 306. Unlike whether conduct is "annoying," the objective design features focus on factual determinations, such as whether a weapon has a weight, length, or length of pull consistent with similarly designed rifles, or is equipped with sights or a scope requiring the weapon to be fired from the shoulder. *See* 88 Fed. Reg. 6,480. And the factors "establish minimal guidelines to govern . . . enforcement" such that they do not encourage arbitrary and discriminatory enforcement. *Kolender*, 461 U.S. at 357–58. "To be sure, it may be difficult in some cases to determine" whether one or more factors support that a firearm is properly classified as a short-barreled rifle; however, courts and juries regularly pass on questions of design and intent, and that there may be close cases does not render the Rule unconstitutionally vague because "[c]lose cases can be imagined under virtually any [enactment]." *Williams*, 553 U.S. at 306. Indeed, Plaintiffs can hardly protest that the Rule is more problematic than the status quo *ex ante*, when ATF's approach to applying the statutory definition was harder to discern.

Additionally, in evaluating a vagueness challenge to an enactment, "a federal court must, of course, consider any limiting construction that a[n] . . . enforcement agency has proffered." *Vill. of Hoffman Ests. v. Flipside Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (considering licensing guidelines prepared by village attorney). Even assuming there is any vagueness with respect to the term "surface area" or any of the other factors, ATF has cured that vagueness with additional guidance. ATF has issued commercial and non-commercial guidance identifying specific firearm-brace combinations it

33

considers short-barreled rifles. *See* ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ; *see also* ATF, *Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles*, https://perma.cc/JZB3-9CUY. Further still, the Rule specifies that "to the extent an individual is unsure about whether a particular firearm with a particular attached 'stabilizing brace' constitutes a rifle, that individual is free to request a classification determination from ATF for additional clarity." 88 Fed. Reg. 6,552; *see also Vill. of Hoffman Ests.*, 455 U.S. at 498 (law subject to less strict vagueness test when party may "clarify the meaning of the regulation by its own inquiry"). And the Rule provided for a 120-day compliance period for regulated parties to work through any ambiguities and come into compliance. *See id.* at 6,480–81.

Therefore, the Rule "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and given the abundance of guidance ATF has provided, the Rule does not present a situation in which a vague law "may trap the innocent by not providing fair warning." *Vill. of Hoffman Ests.*, 455 U.S. at 498 (citations omitted). The Rule is not void for vagueness.

  **f.**   **The NFA does not offend the nondelegation doctrine.**

Plaintiffs argue that the NFA violates the Constitution's nondelegation doctrine if the statute authorizes the Executive Branch to "re-define" the statutory definition of "rifle." Mot. at 13. But this claim is nothing more than Plaintiffs' statutory objections dressed up in constitutional garb, and thus fails for the same reasons. *See supra* pp. 12–21. Moreover, because the Rule merely clarifies the meaning of a statutory term—and is not an exercise of legislative rulemaking authority—there cannot be a delegation concern. *See, e.g.*, *Touby v. United States*, 500 U.S. 160, 164–65 (1991) (explaining that the nondelegation doctrine is a constitutional limitation on the delegation of "legislative power").

At any rate, the NFA's delegation of authority fits comfortably within the bounds of constitutionally permissible delegations. Congress may lawfully delegate decisionmaking authority if it

"lay[s] down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted). A delegation is "constitutionally sufficient if Congress clearly delineates [(i)] the general policy, [(ii)] the public agency which is to apply it, and [(iii)] the boundaries of this delegated authority." *Id.* at 372–73 (citation omitted). This standard is so deferential that the Supreme Court has struck down congressional delegations only twice—both in 1935—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (citation omitted). Since then, "the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards." *Id.* at 2130–31 (Alito, J., concurring in the judgment); *see also id.* at 2129 (collecting cases).

In light of this longstanding precedent, the statute at issue here reflects an intelligible principle that falls well within permissible bounds. As explained, the NFA sets forth a policy: the enforcement of specific federal controls (*e.g.*, registration; taxation) for eight categories of highly dangerous and concealable weapons to curtail their criminal misuse. *See, e.g.*, 26 U.S.C. §§ 5811–12, 5821–22, 5841, 5845(a). The statute authorizes the Attorney General to issue rules and regulations to ensure those controls are enforced in that narrow, definable context. *Id.* at § 7805(a). And by delineating the type of weapons that are subject to its specific requirements, the NFA establishes a clear boundary for the Executive Branch's actions and compares favorably to other congressional delegations that the Supreme Court has sustained against challenges under the nondelegation doctrine. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (listing cases).

In sum, only if this Court "could say that there is an *absence* of standards for the guidance of [ATF's] action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would [the Court] be justified in overriding [Congress's] choice of means

for effecting its declared purpose[s]" in the NFA and the GCA. *See Yakus v. United States*, 321 U.S. 414, 426 (1944) (emphasis added). That is not the case here.[24]

## II.      Plaintiffs cannot demonstrate irreparable harm.

Plaintiffs have also failed to show that they are likely to suffer irreparable harm, an "'indispensable' requirement for a preliminary injunction." *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted). To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical, *Career Colls. & Schs. Of Tex. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2023 WL 4291992, at *6 (W.D. Tex. June 30, 2023) (citation omitted), and must be "so imminent that there is a clear and present need for equitable relief to prevent" it, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation omitted); *accord Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). A plaintiff cannot make this showing with "unsubstantiated and conclusory assertions," *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), but must substantiate any claim of irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989); *accord Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("[Irreparable harm] must be more than speculative . . . ." (cleaned up)). In addition, a plaintiff "must show that the alleged harm will directly result from the action which [he] seeks to enjoin.*" Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

---

[24] Plaintiffs also suggest that Rule offends the separation-of-powers doctrine by rewriting the statutory definition of "rifle," Mot. at 2, 10–11—something it does not do, *see supra* pp. 12–21. At any rate, Plaintiffs cannot turn what is otherwise a straightforward statutory claim into a constitutional issue merely by alleging that ATF's failure to act within the confines of the NFA and the GCA encroaches on Congress's Article I powers. As the Supreme Court explained in *Dalton v. Specter*, 511 U.S. 462 (1994), permitting a plaintiff to assert a separation-of-powers claim like Plaintiffs' would "eviscerat[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." *Id.* at 474. The Court in *Dalton* thus squarely rejected the proposition "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471.

As this Court has explained, "[a]bsent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 584–85 (N.D. Tex. 2022) (O'Connor, J.) (citation omitted). The challenged Rule was published on January 31, 2023, and ATF exercised its enforcement discretion in the Rule to forego enforcement actions for 120 days following publication, during which time owners of NFA-regulated firearms with stabilizing braces could register such firearms tax-free. *See supra* pp. 8–10. Plaintiffs were plainly aware of the Rule and its provisions, as NGR issued a press release on January 31, 2023, noting the Rule's publication and the 120-day registration period. *See* NGR, *Press Release* (Jan. 31, 2023), https://perma.cc/BP4V-34WB. NGR stated that it "looked forward to fighting" the Rule, *id.*, yet Plaintiffs waited until June 8, 2023, to file the instant action, more than four months after the Rule went into effect and after the compliance period had elapsed. *See also* TGR, *Press Release* (June 8, 2023), https://perma.cc/P8WR-H9Y5 (noting that the compliance deadline "has now passed and the rule is in effect").[25]

In the interim, at least eight separate actions were filed in federal court opposing the Rule. *See Britto v. ATF*, No. 2:23-cv-19 (N.D. Tex.); *Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *Firearms Regul. Accountability Coal., Inc. v. Garland*, No. 1:23-cv-24 (D.N.D.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Mock v. Garland*, No. 4:23-cv-95 (N.D. Tex.); *Second Amend. Found. v. ATF*, No. 3:21-cv-116 (N.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.). In seven of these cases, courts have issued rulings on motions for preliminary relief.[26] Only after this Court granted a preliminary injunction in a separate action did Plaintiffs take any legal action on behalf of their members by filing suit in this Court.

---

[25] The instant circumstances are thus unlike *VanDerStok*, where the delay in that action was justified because the plaintiff was awaiting clarification from ATF and, "importantly," filed their motion for a preliminary injunction "two weeks *before* the effective date" of the rule at issue. 625 F. Supp. 3d at 585. Here, Plaintiffs filed suit more than four months after the Rule went into effect.

[26] Plaintiffs' counsel also represents the plaintiffs in *Britto v. ATF*, No. 2:23-cv-19 (N.D. Tex.).

Plaintiffs fail to explain why they waited months to file a lawsuit on behalf of their members. Absent any justification, Plaintiffs' delay "suggests a lack of urgency that militates against a finding of irreparable injury." *See Shenzhen Tange Li'An E-Com., Co. v. Drone Whirl LLC*, 2020 WL 5237267, at *4 (W.D. Tex. Sept. 2, 2020); *see also M-I LLC v. Argus Green LLC*, 2010 WL 11527419, at *4 (E.D. Tex. July 13, 2010) ("When the plaintiff waits several months after learning of the defendant's conduct to move for a preliminary injunction, courts have found that the delay rebuts any presumption of irreparable harm.").

Plaintiffs also fail to cite any irreparable harm that will affect their members. While Plaintiffs allude to Second Amendment violations, Mot. at 19, they do not explain what Second Amendment violations are caused by the Rule and will cause harm to Plaintiffs' members. And contrary to Plaintiffs' assertion, irreparable harm cannot be established by merely alleging a constitutional violation, or this requirement would become a nullity in any case with a constitutional claim. Indeed, a preliminary injunction is inappropriate "unless the party seeking it can demonstrate that '[constitutional] interests are either threatened or in fact being impaired at the time relief is sought.'" *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) (citation omitted); *see also Daniels Health Sciences v. Vascular Health Sci.*, 710 F.3d 579, 585 (5th Cir. 2013) (speculation and conclusory allegations are insufficient to show irreparable harm). For this reason, courts have routinely rejected claims of irreparable harm where, as here, no constitutional violation was present. *See, e.g., Castro v. City of Grand Prairie*, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021) (Lindsay, J.) (holding that a plaintiff's allegations that he had "suffered irreparable harm, including the loss of his constitutional rights," was "conclusory and insufficient to satisfy his burden as the movant" to show irreparable harm); *Sheffield v. Bush*, 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022).

## III.     The balance of the equities and public interest do not favor an injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of

harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decidedly against the issuance of a preliminary injunction here.

In particular, the Rule benefits public safety. Congress passed the NFA for the express purpose of regulating firearms, like short-barreled rifles, that it determined posed a greater risk to public safety because of their unusual and dangerous nature. 88 Fed. Reg. at 6,566. The Rule enhances public safety by clarifying and supporting the enforcement of NFA controls that Congress designed to address this risk. *Id.* Plaintiffs' request to enjoin the Rule would, conversely, decrease public safety by facilitating widespread circumvention of these controls. Any harm to Plaintiffs in complying with the NFA is, by comparison, minimal.

In addition, the Rule serves the public interest by providing regulated parties with greater clarity. ATF initiated the rulemaking process, in part, because the prior system of *ad hoc* classification determinations, at times, resulted in inconsistent classifications of "brace"-equipped pistols. The 98-page Rule, however, thoroughly explains ATF's uniform approach. Further, ATF has also published interim guidance identifying pistol-brace combinations likely to be considered short-barreled rifles under the Rule and will issue classification letters directly to manufacturers. *Supra* pp. 33–34. And the Rule provides that "an individual may contact ATF to receive a [classification] determination." 88 Fed. Reg. at 6,481. Thus, the public interest is better served by the Rule than by its absence.

As a final note, Plaintiffs' unusual litigation tactics in this matter further tilt the balance of the equities against a preliminary injunction. That is, Plaintiffs voluntarily waited for months after the Rule was issued and became effective, and after the 120-day compliance period ended, all without seeking any legal recourse. Plaintiffs waited while numerous litigants around the country diligently litigated their claims, in some cases receiving preliminary relief, though in other cases such relief was denied. Only after this Court issued a preliminary injunction in a challenge to the Rule did Plaintiffs specifically

file suit here. As Judge Boyle explained in rejecting a motion to intervene in another challenge to the Rule, courts should not "incentiviz[e] opportunistic 'injunction shopping,'" whereby litigants wait and see where preliminary relief is awarded, and then try and bring their claims before that specific court. *See Second Amend. Found. v. ATF*, 2023 WL 4304760, at *4 (N.D. Tex. June 30, 2023). For the same reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

## IV. In all events, any relief should be limited to redress Plaintiffs' alleged injuries.

Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Plaintiffs' alleged, cognizable injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). And consistent with traditional equity principles, "injunctive relief should be no more burdensome" to Defendant "than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

Plaintiffs appear to ask this Court to grant them far greater relief, however, by preliminarily enjoining ATF from enforcing the Rule entirely, against Plaintiffs and non-parties alike. Pls.' Mot. for Prelim. Inj. at 1, ECF No. 10. But no such relief is warranted or appropriate. Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) *see also DHS v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring) (lamenting the "asymmetric" effects of nationwide injunctions on "the government's hope of implementing any new policy"). Furthermore, the Rule is subject to litigation in at least nine other

cases in six different federal districts,[27] two of which have pending interlocutory appeals in different Circuits[28]—underscoring why this Court should not attempt to decide its legality for all parties nationwide, particularly on a motion brought by only two parties. *See Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (explaining that "[p]rinciples of judicial restraint" counsel against granting relief to non-parties—particularly where, as here, "[o]ther courts are considering these same issues" at the same time); *see also Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary relief.

Dated: July 17, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN (MT Bar No. 55816869)
TAYLOR PITZ (CA Bar No. 332080)
MICHAEL DREZNER (VA Bar No. 83836)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

*Attorneys for Defendant*

---

[27] *See Britto v. ATF*, No. 2:23-cv-19 (N.D. Tex.); *Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *Firearms Regulatory Accountability Coalition, Inc. v. Garland*, No. 1:23-cv-24 (D.N.D.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Mock v. Garland*, No. 4:23-cv-95 (N.D. Tex.); *Nat'l Rifle Ass'n of Am. v. ATF*, No. 3:23-cv-1471 (N.D. Tex.); *Second Amendment Found. v. ATF*, No. 3:21-cv-116 (N.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).
[28] *See Mock v. Garland*, No. 23-10319 (5th Cir.); *Miller v. Garland*, No. 23-1604 (4th Cir.).

**CERTIFICATE OF SERVICE**

On July 17, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

_/s/ Jody D. Lowenstein_
JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice