IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

---

TEXAS GUN RIGHTS, INC.
and NATIONAL ASSOCIATION
FOR GUN RIGHTS INC.,

    Plaintiffs,

v.                                    Civil Action No. 4:23-cv-00578-O

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,

    Defendant.

---

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I. Plaintiffs have standing. ............................................................................................... 1

II. The Second Amendment protects the Right to Bear Arms, including pistols with stabilizing braces. ........................................................................................................ 2

III. The Rule violates the Major Questions Doctrine, and if it does not, it creates a violation of the Nondelegation Doctrine. ................................................................... 7

IV. Defendant's Rule conflicts with the statutory definition of "rifle." ............................... 9

    A. The Rule conflicts with the statutory text. .............................................................. 9

    B. The rule of lenity should be applied here. ............................................................ 11

V. The Rule is arbitrary and capricious and void for vagueness. ..................................... 12

    A. The Rule is arbitrary and capricious. ................................................................... 12

    B. The Rule is void for vagueness. ........................................................................... 13

VI. Plaintiffs will be irreparably harmed absent an injunction and the balance of harms weighs in Plaintiffs' favor. .......................................................................................... 14

CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*BST Holdings v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ............................................................................... 14

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ............................................................................................ 5

*D.C. v. Heller,*
    554 U.S. 570 (2008) ................................................................................... 4, 5, 6

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ............................................................................... 3

*Funeral Consumers All., Inc. v. Serv. Corp. Intern.*,
    695 F.3d 330 (5th Cir. 2012) ........................................................................... 1, 2

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) ............................................................................... 3

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ............................................................................... 5

*Hunt v. Washington State Apple Advertising Com'n*,
    432 U.S. 333 (1977) ............................................................................................ 2

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ............................................................................... 3

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ............................................................................... 8

*Jones v. SEC*,
    298 U.S. 1 (1936) ................................................................................................ 8

*Maloney v. Singas*,
    351 F. Supp. 3d 222 (E.D.N.Y. 2018) ............................................................... 5

*Marchetti v. United States,*
    390 U.S. 39 (1968) .............................................................................................. 4

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ............................................................................................ 4

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ............................................................................................ 3

*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson,*
    357 U.S. 449 (1958) ............................................................................................ 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) .......................................................................... 2, 4, 5, 6

*NRA v. ATF*,
    700 F.3d 185 (5th Cir. 2012) ............................................................................... 4

*Sig Sauer, Inc. v. Brandon*,
    826 F.3d 598 (1st Cir. 2016) .................................................................................... 10

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
    207 F.3d 789 (5th Cir. 2000) ...................................................................................... 1

*U.S. v. Brooks*,
    681 F.3d 678 (5th Cir. 2012) .................................................................................... 13

*U.S. v. Thompson/Center Arms Co.*,
    504 U.S. 50 (1992) .............................................................................................. 10, 12

*VanDerStok v. Garland*,
    No. 4:22-CV-00691-O, 2022 WL 4009048 (N.D. Tex. Sept. 2, 2022) ............................ 14

*W. Virginia v. EPA*,
    142 S. Ct. 2587 (June 30, 2022) ............................................................................. 7, 8

*Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*,
    16 F.4th 1130 (5th Cir. 2021) .................................................................................. 15

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ................................................................................................... 3

*Yukutake v. Conners*,
    554 F. Supp. 3d 1074 (D. Haw. 2021) ........................................................................ 4

**Statutes**

18 U.S.C. § 921 ........................................................................................................................ 3

26 U.S.C. § 5845 ...................................................................................................................... 3

**Other Authorities**

David G. Browne, Treating the Pen and the Sword As Constitutional Equals: How and
    Why the Supreme Court Should Apply Its First Amendment Expertise to the
    Great Second Amendment Debate,
    44 Wm. & Mary L. Rev. 2287 (2003) ......................................................................... 7

James A. D'Cruz, Half-Cocked: The Regulatory Framework of Short-Barrel Firearms,
    40 Harv. J.L. & Pub. Pol'y 493 (2017) ....................................................................... 7

Michael S. Obermeier, Scoping Out the Limits of "Arms" Under the Second
    Amendment,
    60 U. Kan. L. Rev. 681 (2012) .................................................................................... 7

**Federal Regulations**

88 Fed. Reg. 6478 (Jan. 31, 2023) ..................................................................................... 2, 13

iv

I.  **Plaintiffs have standing.**

An association has associational standing when: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (citations omitted). To satisfy the first prong of standing, "an organization suing as representative [must] include at least *one member with standing* to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *Funeral Consumers All., Inc. v. Serv. Corp. Intern.*, 695 F.3d 330, 343–44 (5th Cir. 2012) (citing *United Food and Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996)) (alterations in original) (emphasis added).

Plaintiffs seek to enjoin Defendant from enforcement of an unlawful Rule against their members. Plaintiffs are membership organizations dedicated to preserving and protecting the right to bear arms. ECF 1 ¶¶ 4–5. Plaintiffs seek the requested relief in their capacity as representatives of their members. *Id.* Further, Plaintiffs seek the requested relief on behalf of the individual members Justin Maloney, a member of TGR, and Tyler Witzke, a member of NAGR. All individual members are directly harmed by the ATF's unlawful Rule. *See* McNutt Decl.; Hill Decl. Justin Maloney and Tyler Witzke, because of Defendant's rule, cannot purchase stabilizing braces because they do not want to register their firearms under the new rule. McNutt Decl. ¶ 3; Hill Decl. ¶ 3. Other TGR and NAGR members owned pistols with stabilizing braces subject to the new rule. *See generally* McNutt Decl.¶ 2; Hill Decl. ¶ 2. Instead of registering the firearms, the members rendered the pistol braces unusable as required by the new rule. *See generally* McNutt Decl.¶ 2; Hill Decl. ¶ 2. Plaintiffs have standing because: (1) the individual members have standing to sue

1

in their own right; (2) Plaintiffs seek to protect interests that are germane to their organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977); *see also Funeral Consumers*, 695 F.3d at 343–44 (5th Cir. 2012) (cleaned up).

## II. The Second Amendment protects the Right to Bear Arms, including pistols with stabilizing braces.

The Second Amendment protects "an individual right to keep and bear arms for self-defense." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2125 (2022). This right applies to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 2132 (citations omitted). "[T]he Second Amendment's definition of 'arms' . . . covers modern instruments that facilitate armed self-defense." *Id*. So when an individual bears an instrument that facilitates armed self-defense, "the Constitution presumptively protects that conduct." *Id*. at 2129–30. And the government bears the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130.

Defendant asserts four arguments as to why the Second Amendment does not apply in this case. All four are wrong.

First, Defendant argues that stabilizing braces are just "accessories" or "attachments" that do not implicate the Second Amendment. ECF 27:36–37. But this is not a case about just stabilizing braces. The Rule seeks to regulate "firearms with an attached 'brace' device," and not "stabilizing braces" by themselves. 88 Fed. Reg. 6478 (Jan. 31, 2023). Pistols with stabilizing braces are undeniably "instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. Moreover, the Second Amendment covers firearms *and* items "necessary to use" those firearms.

2

*Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing the "right to possess the magazines necessary to render . . . firearms operable"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use").[1]

Second, Defendant argues that the Rule does not implicate the Second Amendment because this is just about registration, and gun registries are always constitutional. ECF 27:37–39. There is no support for this proposition—registries certainly implicate constitutional rights because they eliminate the ability to exercise a constitutional right anonymously. *See, e.g., Watchtower Bible & Tract Soc'y of N. Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002). The right to anonymity protects "unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). As the Court explained in *NAACP v. State of Ala. ex rel. Patterson*, "compelled disclosure of membership [lists] of an organization engaged in advocacy of particular beliefs" is a "restraint on freedom of association." 357 U.S. 449, 462 (1958). It is the same as requiring "adherents of a particular religious faith or political parties [to] wear identifying arm bands." *Id*. (citation omitted).

---

[1] Defendants also argue that stabilizing braces are just like silencers. This analogy is unhelpful because silencers are specifically defined as "firearms" in 18 U.S.C. § 921(a)(3) and 26 U.S.C. § 5845. Stabilizing braces, conversely, are not defined as a firearm, meaning Defendants' authority to regulate silencers is different from their authority to regulate stabilizing braces. Plaintiffs also note that no court has yet to evaluate silencers under *Bruen*, and perhaps with the benefit of this new case, a court may evaluate silencer regulations under the Second Amendment.

In the same way,[2] Defendant is wrong to argue that a firearm registry "does not implicate the Second Amendment." ECF 27:37. If that were the case, then the government could require *anyone* who owns *any firearm* covered by the Second Amendment to register that weapon with the federal government.[3] But the Government here bears the burden in this case to establish that this particular gun-registration scheme for pistols with stabilizing braces is supported by historical evidence. *See Bruen*, 142 S. Ct. at 2111. "Although certain registration requirements may be longstanding, it does not follow that *all* registration requirements are." *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1086 (D. Haw. 2021) (emphasis added). Defendant ultimately cannot justify the Rule under the Second Amendment because there is no historical analogue to support the type of registration-and-tax regime established by the Rule.

Third, Defendant argues that the Second Amendment does not apply to pistols with stabilizing braces because they are "dangerous and unusual" weapons. ECF 27:39–41. The *Bruen* Court did *not* adopt a generic "dangerous and unusual" weapon standard, which would allow any district court to consider, subjectively, whether a particular firearm was "dangerous and unusual."[4] Instead, the Court squarely focused lower courts on the proper standard: "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. In fact, when applying this standard, the Court only

---

[2] The Supreme Court has explained that First Amendment case law illuminates the Second Amendment. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010); *D.C. v. Heller*, 554 U.S. 570, 595 (2008); *NRA v. ATF*, 700 F.3d 185, 198 (5th Cir. 2012) (using First Amendment principles to interpret the Second Amendment).

[3] And furthermore, a registration scheme that requires the submission of information to law enforcement creates the threat of self-incrimination. *Marchetti v. United States,* 390 U.S. 39 (1968).

[4] The *Bruen* Court carefully considered the phrase "dangerous and unusual," cautioning that "we were not 'undertaking an exhaustive historical analysis today of the full scope of the Second Amendment'" and then moved on to the "constitutionality of the District of Columbia's handgun ban." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).

4

considered whether firearms at issue are "in common use today for self-defense," notably dropping the adjective "dangerous." *See Bruen*, 142 S. Ct. at 2143.

Defendant points to *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) to support its theory that pistols with stabilizing braces are actually "dangerous and unusual." But that decision does not apply *Bruen*. Moreover, pistols are not machine guns, and pistols with stabilizing braces are not more dangerous than an average pistol without a stabilizing brace. The record indicates that stabilizing braces make the firearm safer and more accurate. ECF 1 ¶¶ 19–24. Moreover, these firearms are not "unusual" because the Second Amendment protects all weapons "in common use." *Bruen*, 142 S. Ct. at 2143. Stated another way, only those firearms "*not* typically possessed by law-abiding citizens for lawful purposes" do not enjoy Second Amendment protection. *Heller*, 554 U.S. at 625 (emphasis added). Pistols with stabilizing braces are ubiquitous and therefore common. The Congressional Research Service estimates there are between 10 and 40 million pistols with stabilizing braces in the United States. ECF 1 ¶ 24.[5] Defendant does nothing to dispute this, other than saying it believes there are only 3 million of these braces. Under either scenario, these firearms are common.[6]

Fourth, and finally, Defendant argues the Rule and the NFA, if even implicated, are supported by a robust history and tradition of firearm regulation. ECF 27:41–44. Because the Second Amendment is implicated by the Rule, the burden rests squarely upon Defendant to justify

---

[5] "Handguns, Stabilizing Braces, and Related Components," Congressional Research Service (April 19, 2021), available here.

[6] In *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016), Justice Alito stated in concurrence that stun guns "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that just "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* (Alito, J., concurring). And the Eastern District of New York found nunchakus to be protected arms despite the Plaintiffs only being able to prove "64,890 nunchakus" in civilian hands. *Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018).

its regulation. This is the high bar Defendant must meet: "whether [the Rule is] consistent with the Second Amendment's text and historical understanding," *Bruen*, 142 S. Ct. at 2131. To meet this challenge, Defendant must "identify a well-established and representative historical analogue." *Id*. at 2133. But much more is required. The "analogical reasoning" requirement is not "a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. "Courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* In *Heller*, the Court explained the baseline standard: "[f]or most of our history . . . the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens." *Heller*, 554 U.S. at 625. So merely pointing out prior regulatory schemes is not enough.

Defendant vaguely claims that from "colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements." ECF 27:42. Specifically, Defendant points to "door-to-door surveys" in three states, without evidence that these surveys were required, universal, for what type of weapon, and without discussing the purpose and use of such surveys. Defendant then cites a handful of laws requiring "inspection" of "firearms" and "all musket and pistol barrels" for safety purposes, without any indication that the inspections were part of the type of registration-and-taxation scheme established by the Rule. ECF 27:42–44. Defendant finally cites a few examples of licenses to "export gunpowder," three states that required "licenses for the sale of pistols" and the possession of personal firearms "for sporting purposes," and some taxation schemes. *Id.*

Defendant argues it may now impose a *specific* type of registration-and-taxation scheme because some states historically regulated firearms *in general*. If Defendant is correct, then the

government may impose a national registry for any type of firearm (or perhaps all firearms). If the standard announced in *Bruen* is simply that the government must identify, in general, prior regulatory schemes, then any firearm registry would almost certainly be constitutional.

Based on a review of the historical evidence, Plaintiffs are aware of no regulation of a firearm based on the length of the barrel prior to the National Firearms Act in 1934. In fact, there appears to be a broad historical tradition, contemporaneous with the founding era, of short-stocked pistols or short-barreled rifles in widespread existence. *See, e.g.,* James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 503 (2017); Michael S. Obermeier, *Scoping Out the Limits of "Arms" Under the Second Amendment*, 60 U. Kan. L. Rev. 681, 706 (2012) ("Sawed-off shotguns" and "short-barreled rifles . . . are analogous to weapons existing in the eighteenth century."); David G. Browne, *Treating the Pen and the Sword As Constitutional Equals: How and Why the Supreme Court Should Apply Its First Amendment Expertise to the Great Second Amendment Debate*, 44 Wm. & Mary L. Rev. 2287, 2295 (2003) ("compact and even pistol-sized shotguns were used in combat as far back as the seventeenth century").

In short, there is no evidence of founding era tax-and-registration schemes for short-barrel rifles (or pistols with anything similar to a stabilizing brace). Defendant, therefore, has not met its burden under *Bruen*.

**III.     The Rule violates the Major Questions Doctrine, and if it does not, it creates a violation of the Nondelegation Doctrine.**

The Major Questions Doctrine refers to a "particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (June 30, 2022). When agencies locate

a "newfound power in vague language" of an act, courts should consider carefully whether Congress "meant to confer [on the agency] the authority it claims." *Id*. at 2610.

Defendant, as expected, believes the Rule is no big deal and not "highly consequential." But consider for a moment what they portend to do: the Rule takes up to 40 million pistols (not regulated by the National Firearms Act) and then labels those pistols as "short-barrel rifles." Congress clearly did not intend for pistols to be covered by the National Firearms Act, and so it is not a frivolous question to consider whether Congress intended to grant such a substantial power of re-definition (pistols to rifles) to Defendant. We think they did not. As explained by the Supreme Court, the Major Questions Doctrine is relevant when a regulation is "unprecedented" and effects a "fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind." *West Virginia,* 142 S. Ct. at 2612 (citation omitted). Here, after a decade of taking one position, Defendant entirely changes its position and now grasp a power it has shunned by redefining "rifle" to mean "pistol."

If Congress did, indeed, delegate Defendant this power to re-define pistols as rifles, then the relevant statutes' "total absence of guidance is impermissible under the Constitution." *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022). Defendant's position (that this is no big deal) is no defense. If Defendant is "permitted gradually to extend [its] powers by encroachments—even petty encroachments—upon the fundamental rights, privileges and immunities of the people, we shall in the end, while avoiding the fatal consequences of a supreme autocracy, become submerged by a multitude of minor invasions of personal rights, less destructive but no less violative of constitutional guaranties." *Jones v. SEC*, 298 U.S. 1, 24–25 (1936). If Congress did, in fact, delegate the power to define any firearm (including pistols) as a "rifle" and bring those firearms

under the NFA's taxation-and-registration requirements, then such unbridled power must be checked by the Nondelegation Doctrine.

**IV.     Defendant's Rule conflicts with the statutory definition of "rifle."**

Beyond the constitutional concerns with the Rule, it also violates the statute because it purports to rewrite the plain and unambiguous statutory definition of "rifle." To the extent that Defendant believes the definition is ambiguous and requires some "clarification" in order to understand, then the Rule of Lenity requires the ambiguity to be cleared up in favor of the Plaintiffs, not the Defendant. Either way, the Rule is unlawful and must be set aside.

**A.     The Rule conflicts with the statutory text.**

The Rule is unlawful because it is an attempt to rewrite the statutory definition of "rifle." As a result, the rule necessarily *conflicts with* the statute, and it is thus unlawful and must be set aside.

Defendant makes several arguments as to why they believe the Rule does not conflict with the statutory definition of "rifle." First, it says that Courts have long recognized that a pistol could be made into a rifle if it had rifle components. Second, it argues that the statute requires it to review the "objective design features" of a weapon when determining whether or not a particular weapon is a "rifle." Third, it claims there is no "exclusive use" requirement and so it is immaterial as to whether or not a pistol is actually designed, made and intended to be fired as a pistol—so long as, Defendant argues, it could at some point *also* be fired from the shoulder. But all three of these assertions fail.

First, Defendant claims that the Supreme Court's opinion in *U.S. v. Thompson/Center Arms Co.* works against Plaintiffs because: "[T]he Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm 'within the "intended to be fired from the

9

shoulder" language contained in the [NFA's] definition of rifle.'" ECF 27:29 (quoting *U.S. v. Thompson/Center Arms Co.*, 504 U.S. 505, 513 n.6 (1992) (quoting 26 U.S.C. § 5845(c))). But it is wrong. First, the footnote they cite to is from the Court's plurality opinion and does not constitute a binding opinion of the court. But even if it did, that case dealt with *rifle* components which were shipped with a pistol.[7] Third, and most importantly, the Court in *Thompson/Center Arms* concluded the opposite of what Defendant is now claiming it did. The Court actually concluded that packaging all of those parts together *did not* make the weapon a "rifle" subject to the requirements of the NFA. *Thompson/Center Arms Co.*, 504 U.S. at 518 ("[W]e conclude that the Contender pistol and carbine kit when packaged together by Thompson/Center *have not been "made" into a short-barreled rifle* for purposes of the NFA."). Defendant's argument strains credulity.

Second, Defendant claims that the statute requires it to look at the "objective design features" of a weapon, and that all the Rule does is facilitate that. Defendant says "courts have agreed . . . that ATF properly considered the objective design features of a particular product[.]" ECF 27:31–32.[8] They cite to *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), to support this argument. But that case dealt with the statutory definition of a "silencer," which, as already discussed *supra*, is decidedly different from the definition of a "rifle."

Here, there is no dispute that a pistol with a *rifle* stock could be a "rifle" for NFA purposes. That's what the statute requires: a weapon with a rifle stock was clearly designed, made and

---

[7] In *Thompson/Center Arms Co.*, a carbine conversion kit sold with a pistol could be used to turn a pistol into a short-barreled rifle. That is not the case here because the carbine conversion kit was designed, made, and intended to be fired from the shoulder.

[8] Plaintiffs also point out the inconsistency in ATF's arguments. When convenient for their Second Amendment response, ATF argues that a stabilizing brace is just a part and not subject to the Second Amendment analysis, but when it comes to their response on these statutory arguments, they consider everything as one item for the analysis.

intended to be fired from the shoulder. What the rule does is unlawfully *expand* the definition of "rifle" to cover any weapon which *may* or which *could* be fired from the shoulder—regardless of whether it was *actually* designed, made and intended to be fired from the shoulder.

Finally, as to Defendant's third argument that there is no "exclusive use" requirement in the definition of "rifle"—Plaintiffs never made such a claim. What Plaintiffs have argued, consistent with the statutory text, is that a weapon must be designed, made and intended to be fired from the shoulder to qualify as a rifle. Thus, any weapon which was *not* designed, *not* made, and was *not* intended to be fired from the shoulder *cannot be* a rifle. The cases cited to by Defendant confirm this as well.

Specifically, Defendant cites to several cases for the proposition that courts do not read words into statutes that aren't there—and yet, that is the entire basis of the Rule, and Plaintiffs' statutory argument against it. As Plaintiffs explained in their opening brief, what the Rule does is expand the statutory definition of "rifle" to include any weapons that "may be fired from the shoulder" or "could be fired from the shoulder." But those words—'may' and 'could'—do not appear anywhere in the statute.

For these reasons, and as further explained in Plaintiffs' opening brief, the rule conflicts with federal law and must be set aside.

**B.     The rule of lenity should be applied here.**

Defendant gives short shrift to Plaintiffs' rule of lenity argument on statutory interpretation. It simply concludes "traditional tools of statutory interpretation firmly support the Rule's application of the statutory definition of 'rifle' to weapons equipped with 'stabilizing braces[.]'" ECF 27:33. But that's not true, and Defendant's near decade-long finding of the *opposite* helps to

illustrate this point. Indeed, Defendant interpreted the statutory text one way for nearly a decade, yet now concludes the exact opposite.

In *Thompson/Center Arms Co.* the Supreme Court already concluded that a different definition under the NFA was ambiguous and applied the rule of lenity. *See Thompson/Center Arms Co.*, 504 U.S. at 506. As explained, Plaintiffs believe the definition of "rifle" to be plain and unambiguous. To the extent that there *is* ambiguity, as Defendant argues, that ambiguity *cannot* be interpreted to increase criminal liability as the Rule purports. Thus, the rule of lenity requires the Rule to be set aside.

## V.     The Rule is arbitrary and capricious and void for vagueness.

### A.     The Rule is arbitrary and capricious.

As Plaintiffs explained in their opening brief, Defendant failed to acknowledge its earlier position. Instead, Defendant continues to argue that it was "a change in position from some of ATF's previous classifications or positions." ECF 27:35 (citing 88 Fed. Reg. 6501–02). Yet, Defendant does not acknowledge the full weight of the reversal they are engaging in or acknowledge the extent of its earlier assertions on the topic.

For example, as Plaintiffs explained in their opening brief: in 2015, Defendant issued an "open letter" which stated in no uncertain terms that attaching a stabilizing brace to a pistol "does not alter the classification of the firearm or subject the firearm to National Firearms Act (NFA) control."[9] *See also* ECF 1 ¶¶ 30–31. Americans everywhere relied upon ATF's position, apparently now to their own detriment as Defendant now decided to pull a complete 180 in issuing the Rule challenged herein.

---

[9] ATF Open Letter on the Redesign of "Stabilizing Braces," from Max Kingery, Acting Chief, Firearms Technology Criminal Branch, Firearms and Ammunition Technology Division, ATF (Jan. 16, 2015), available [here](#).

Defendant's failure to acknowledge the significance and clarity of its prior statements here, and to instead characterize those as merely clarifying uncertainty that did not exist, is absolutely arbitrary and capricious, and for those reasons, the Rule should be set aside.

### B.    The Rule is void for vagueness.

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *U.S. v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012). But encouraging arbitrary and discriminatory enforcement is exactly what the Rule does.

As Plaintiffs explained in our opening brief, Defendant's "two-step" analysis is flawed. First, it determines whether the mythical "surface area" exists on the rear of the weapon. Defendant argues this is not vague because the rule "includes dozens of pictures and graphics illustrating the surface area the Rule is concerned with—clarifying any remaining ambiguity." ECF 27:45. Further, Defendant attempts to clarify its argument by defining 'surface area' as "[T]he amount of area covered by the surface of something." *Id.*. Although Defendant states that this is a "term commonly used and understood by people of ordinary intelligence," it fails to actually articulate what that term means in the context of firearms. *Id.*

And Defendant does not even attempt to explain how allowing bureaucrats to make decisions based upon things like marketing material (including "indirect" marketing material, which is also an undefined term), and a catch-all called "information demonstrating the likely use of the weapon in the general community" (*see* 88 Fed. Reg. at 6574–6575) are not vague. Nor could they. Instead, they just argue that because Plaintiffs could ask ATF for their opinion on

13

whether a particular weapon qualifies or not, the rule itself is not vague. But that reasoning just underscores that the rule itself is absolutely vague.

The Rule is void for vagueness and must be set aside.

## VI. Plaintiffs will be irreparably harmed absent an injunction and the balance of harms weighs in Plaintiffs' favor.

If no injunction is granted, then Plaintiffs must either destroy their weapon by permanently removing the stabilizing brace or submit to placing their names on a government registry. Defendant concedes that if Plaintiffs prove a constitutional violation, then no further irreparable injury must be shown. ECF 27:49. As shown above, Plaintiffs are likely to succeed on their constitutional claims. As the Fifth Circuit observed, "the loss of constitutional freedoms for even minimal periods of time . . . unquestionably constitutes irreparable injury." *BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (citation omitted). Even "threatened" constitutional harm can constitute irreparable harm. *VanDerStok v. Garland,* No. 4:22-CV-00691-O, 2022 WL 4009048, at *9 (N.D. Tex. Sept. 2, 2022). And "it is no answer to say that [he] may avoid the harm by complying with an unlawful agency rule" and enduring a tax, lengthy waiting period, and ongoing burdens on a registered weapon. *Id.* (quotation omitted).

Defendant contends that Plaintiffs "waited months to file a lawsuit on behalf of their members" and therefore bear a burden to explain themselves. ECF 27: 51. But this has no support in the law. In fact, by its own admission, enforcement of Defendant's rule did not occur until 120 days after the initial promulgation of the rule on January 31st, 2023. *Id.* at 50. The compliance period, therefore, ended on May 31st, 2023. Plaintiffs filed their complaint a week later. Defendant unconscionably equates a week with "a substantial period of delay" or "wait[ing] months to file." *Id.* at 50; 51. Defendant's cited cases speak of significant delay that undermined the urgency of the harm—there was no delay here and Plaintiffs' harm is irreparable.

14

There is no harm to ATF from pausing enforcement of the Final Rule and maintaining the status quo. Indeed, "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.,* 16 F.4th 1130, 1143 (5th Cir. 2021) (citation omitted). The balance of equities and public interest weigh in favor of an injunction.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion and enter an injunction prohibiting Defendant from enforcing the Rule.

Dated this 28th day of July, 2023.

    Respectfully Submitted,

    WISCONSIN INSTITUTE FOR
    LAW & LIBERTY, INC.

    s/ *Daniel P. Lennington*
    Richard M. Esenberg (*admitted pro hac vice*)
    Daniel P. Lennington (*admitted pro hac vice*)
    Lucas T. Vebber (*admitted pro hac vice*)
    330 East Kilbourn Avenue, Suite 725
    Milwaukee, WI 53202
    Telephone: (414) 727-9455
    Facsimile: (414) 727-6385
    Rick@will-law.org
    Dan@will-law.org
    Lucas@will-law.org

    THE LAW OFFICE OF
    JASON NASH, P.L.L.C.

    Jason C. Nash (Texas Bar No. 24032894)
    601 Jameson Street
    Weatherford, TX 76086
    Telephone: (817) 757-7062
    jnash@jasonnashlaw.com

    ARRINGTON LAW FIRM

    Barry K. Arrington (*admitted pro hac vice*)
    (Texas Bar No. 24129555)

>4195 Wadsworth Boulevard
>Wheat Ridge, CO 80033
>Telephone: (303) 205-7870
>barry@arringtonpc.com
>
>*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice to all attorneys of record.

Dated this 28th day of July, 2023.

>s/ *Daniel P. Lennington*
>Daniel P. Lennington